1

```
1              IN THE UNITED STATES DISTRICT COURT
             FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
2                      HARRISBURG DIVISION

3

UNITED STATES OF AMERICA          :   CASE NO.
4                                  :
        v.                         :
5                                  :
                                   :
6  BRIAN SALVADO                   :   1:18-CR-00228

7

8                  TRANSCRIPT OF PROCEEDINGS
                           SENTENCING
9

10         Held before the HONORABLE SYLVIA H. RAMBO
             November 25, 2020, commencing at 9:32 a.m.
11   Courtroom No. 3, Federal Building, Harrisburg, Pennsylvania

12

13

APPEARANCES:
14

CHRISTIAN T. HAUGSBY, ESQUIRE
15  United States Attorney's Office
    228 Walnut Street, Suite 220
16  Harrisburg, PA  17108
        For the United States
17

ARI D. WEITZMAN, ESQUIRE
18  Federal Public Defender's Office
    100 Chestnut Street, Suite 306
19  Harrisburg, PA  17101-2540
        For the Defendant
20

21

22

        Proceedings recorded by machine shorthand; transcript
23  produced by computer-aided transcription.
    _____
24              Wendy C. Yinger, RMR, CRR
                   Official Court Reporter
25            wendy_yinger@pamd.uscourts.gov
```

1          THE COURT:  Good morning, everyone.

2          MR. HAUGSBY:  Good afternoon, Your Honor.

3          MR. WEITZMAN:  Good morning.

4          THE COURT:  Good morning.

5          MR. HAUGSBY:  I thought it was going to be this

6   afternoon, but it's earlier.  Your Honor, this is the case of

7   United States of America versus Brian Salvado.  It is this

8   Court's number 1:18-CR-228.  This is the time and place that

9   the Court has set for a sentencing in the Defendant's criminal

10  case.  The Defendant is present in the courtroom with counsel,

11  Assistant Federal Public Defender Ari Weitzman.

12          THE COURT:  Mr. Salvado, have you reviewed the

13  pre-sentence report that was filed in this case?

14          THE DEFENDANT:  Yes, I have.

15          THE COURT:  Mr. Weitzman, you have filed objections

16  to the report.  May we hear your argument?

17          MR. WEITZMAN:  Your Honor, the one pending objection

18  pertains to the special assessment.  This appears to be a novel

19  issue, at least in our circuit, insofar as our appeals court

20  has not addressed the issue of burden of proof, future income,

21  and things of that nature.

22          Our position, as stated in the sentencing memorandum,

23  is that Mr. Salvado is currently indigent.  I think that is not

24  in dispute.  I think the only potential dispute is whether Mr.

25  Salvado's future earning ability is such that he would be

1  deemed to be non-indigent.

2          Number one, we don't believe the Court ought to be

3  considering his future earning capacity.  Number two, if the

4  Court is so inclined to consider that, we would ask the Court

5  to also consider that Mr. Salvado is going to be receiving

6  quite a robust sentence by this Court, best case scenario.  He

7  would be branded as a sex offender, which certainly is not

8  going to increase his marketability or attractiveness for

9  obtaining even menial employment.

10          This is a man who, regardless of whatever sentence

11  the Court imposes, is going to continue as he has historically

12  struggled to make ends meet.  We think he is indigent, and

13  we're asking the Court to not impose the special assessment.

14          THE COURT:  I would ask the Government to respond to

15  the argument.

16          MR. HAUGSBY:  Thank you, Your Honor.  The Government

17  does dispute that characterization, and I would submit that

18  Your Honor certainly should consider the Defendant's future

19  circumstances when determining whether to assess the JVTA

20  penalty.  The Defendant is going to be facing a lengthy term of

21  imprisonment, as Mr. Weitzman said, and as part of his

22  imprisonment, will be required to work.

23          He will have earnings from that work.  And I think it

24  is certainly appropriate for the Court to consider the

25  availability of those proceeds to go towards financial

4

1  penalties in this case or restitution.

2         The other thing I would say is that the Defendant may

3  be indigent at this point.  My understanding is that the

4  Defendant has been incarcerated for the last three years.  He

5  hasn't been working while he's been awaiting the resolution of

6  these proceedings.  That's true for many similarly situated

7  offenders that would come before Your Honor and would be known

8  to you.

9         So we would submit that the objection should be

10 overruled and that the Court should consider that the Defendant

11 will be employed and may be employable in the future at the

12 time that he completes his sentence.

13         THE COURT:  Any other objections?

14         MR. WEITZMAN:  There are no other pending objections.

15         THE COURT:  Do you wish to argue on his behalf?

16         MR. WEITZMAN:  With respect to sentencing, Your

17 Honor?

18         THE COURT:  Yes.

19         MR. WEITZMAN:  May I remain seated, Your Honor?

20         THE COURT:  Pardon?

21         MR. WEITZMAN:  May I remain seated?

22         THE COURT:  Yes.

23         MR. WEITZMAN:  Your Honor, as outlined in my

24 sentencing memorandum, I think that it's important to

25 differentiate Mr. Salvado and his conduct from a majority of

5

1  the other child pornography producers that come before this

2  Court.  Mr. Salvado is in the minority of child pornography

3  offenders insofar as he is not a contact offender.  There is no

4  evidence that he was ever a contact offender, and he was not

5  present when any -- physically present when any of the conduct

6  was occurring.

7          That really differentiates Mr. Salvado's conduct from

8  a lot of other folks, and the guidelines fail to meaningfully

9  differentiate between Mr. Salvado's conduct and someone who is

10  actually present while the offenses are occurring.  While

11  everybody in this room, by virtue of our experience in the

12  criminal justice system, easily recognizes what Mr. Salvado did

13  was not only immoral but, more importantly, illegal, it's less

14  apparent to someone like Mr. Salvado.

15          Don't get me wrong, Your Honor, he certainly

16  understands right from wrong.  But from the confines of his own

17  home, I think that it was murky in Mr. Salvado's mind as to

18  what exactly it was that he was doing.  As indicated, he met

19  every single one of these victims on an adult website.  This is

20  not intended to victim bash in any way, but you have young men

21  who are registering false information on an adult homosexual

22  website who are clearly looking for some sort of attention.

23          And that makes it an easy target, so to speak, for

24  Mr. Salvado.  It's clear that Mr. Salvado knew the ages of a

25  majority of these victims at some point during the conduct, but

6

1  there is no indication that he was targeting individuals who
2  were under the age of 18.  And again, I think that's an
3  important distinction.
4          Dr. Erikson's report, I think, perfectly encapsulates
5  his behavior and Mr. Salvado.  Dr. Erikson rules out the most
6  troubling possibility for his behavior, which is an antisocial
7  personality disorder.  Dr. Erikson also opines that Mr. Salvado
8  does not have particular pedophiliac interests.  Rather, what
9  he determines is that based upon Mr. Salvado's individual
10 characteristics, he has intimacy deficits which, in the age of
11 the internet, again was an easy entree for Mr. Salvado to hold
12 himself out to be someone who he clearly was not.
13         Mr. Salvado is and always has been a pauper.  Mr.
14 Salvado suffers from learning disabilities.  Mr. Salvado has
15 always been an outcast, whether as a young child, an adolescent
16 in junior high, high school.  And even into adulthood, this man
17 has struggled to form meaningful relationships really, Your
18 Honor, for reasons outside of his control.
19         Mr. Salvado was not dealt a particularly good hand in
20 life.  And I think that's reflected in the struggles that he
21 continues to have.  And I think that that is one of the major
22 motivating factors that pushed Mr. Salvado into this particular
23 conduct.  He found a group of individuals who would actually
24 pay attention to him, particularly because he was holding
25 himself out to be someone other than who he is.  This also is a

7

1  man, Your Honor, who has never in his life done one day in jail
2  before, and he has been incarcerated now for approximately
3  three years.

4          And as the Court is well aware, during the pandemic,
5  particularly in Dauphin County Prison, a day of a prisoner is
6  much more difficult than without the pandemic in DCP.  While I
7  recognize that, God willing, the pandemic is temporary, Mr.
8  Salvado has suffered the past three years being incarcerated in
9  what I consider to be an absolute hell hole.

10          With respect to the guideline calculations, and with
11  respect to Mr. Salvado's ongoing conduct, that's a double-edged
12  sword.  The Government did offer Mr. Salvado the benefit, in
13  quotes, of capping his exposure at 30 years.  And we recognize
14  and appreciate that concession.  At the same time, the number
15  of victims involved have skyrocketed the guidelines.

16          And as outlined in my sentencing memo, and I hope
17  that I was able to make sense to the Court, that given Mr.
18  Salvado's deficiencies and the lack of intervention, the lack
19  of insight at that time, and the lack of an arrest, it's no
20  surprise that there were multiple victims and this was ongoing
21  conduct.  I can't imagine one case that's ever come before this
22  Court that was prosecuted by the federal authorities for one
23  incident that occurred.  This is common what we see here.

24          And again, the guidelines simply are unnecessarily
25  excessive and harsh in light of the conduct.  And really what

8

1   we're talking about is a troubled man receiving and

2   distributing of himself naked pictures.  Those pictures were

3   never put on the internet.  No one other than Mr. Salvado has

4   viewed those pictures.  And a sentence within the guideline

5   range, to me, is unnecessary.

6           To keep Mr. Salvado incarcerated into his 60's, Your

7   Honor, to me, would be absolutely tragic.  I appreciate the

8   Court's time.  Mr. Salvado has prepared a statement, Your

9   Honor.  But I was discussing with the court reporter that I

10  think the Court is going to really struggle to understand Mr.

11  Salvado, so we'll give it a shot, because he's a fast talker

12  and he does have a speech impediment.

13          THE COURT:  Does he have it written?

14          MR. WEITZMAN:  He does, Your Honor.

15          THE COURT:  Do you wish to read it instead of having

16  him do it?

17          MR. WEITZMAN:  I don't even -- I can try to, but if

18  we can start with Mr. Salvado and see if he can do it.

19          THE COURT:  You may proceed, Mr. Salvado.  Slowly.

20          THE DEFENDANT:  Thank you.  Good morning, everyone.

21  I've been raised to (inaudible)

22          THE COURT:  You know what, I'm going to have him take

23  his mask off and put it back on when you're done.

24          THE DEFENDANT:  Okay.

25              (Complied)

9

1          THE DEFENDANT:  Should I start over?

2          THE COURT:  Yes.

3          THE DEFENDANT:  Okay.  Thank you.  Good morning,

4  everyone.  I've been raised to listen to my elders, do as they

5  say, be polite, show respect and kindness to all.  I also

6  learned while growing up the difference between right and

7  wrong.  Since my arrest on December 13th, 2017, some 35 months

8  ago, I have had plenty of time to reflect on my past life.  And

9  still today at age 47, I am still learning new things daily.

10          I have come to the conclusion while being

11  incarcerated these past 35 months, what I did was wrong and

12  illegal.  I was hurtful and selfish to others.  The internet

13  was my escape and -- sorry, excuse me.  The internet was my

14  escape, and I figured out it made me more desirable having a

15  better education than I had and being very well off, being

16  wealthy.  I didn't think about the end result because I was too

17  busy thinking of myself and not how I could hurt someone.

18  After all, it was the internet and it's not like I'll ever meet

19  anyone.

20          I found out I was really lonely and stressed and the

21  internet took all my worries away.  Or so I thought.  I did

22  provide to the ones I chatted with my real name, my real age,

23  real location of where I lived, and real pictures of myself.  I

24  felt comfortable talking because they asked questions of what

25  college I attended and how did I make my money.  Yeah, it made

1  me feel better about myself like I was actually doing nothing

2  wrong.

3          Unfortunately, I talked to everyone and every age,

4  usually not over 40 because sometimes my story wouldn't hold

5  up.  I regret to say I even talked to minors under 18.  Heck, I

6  was 14 and I knew I was gay and I never once thought about the

7  old saying, don't talk to strangers.  I felt in control as we

8  talked, sometimes even sexual talk or sometimes we exchanged

9  pictures.

10          I never thought about how they would really feel

11  sending a stranger a pictures of them self let alone a naked

12  one.  I, too, was caught up in the attention I was getting.  I

13  didn't care or show respect to them either.  I'm 47 and could

14  have children 14 or 16.  I now know being more aware of my

15  wrongdoings as a child, I'd be upset, embarrassed, or probably

16  even mad.  At 14 or even 17, they should be doing school work,

17  chores, helping mom or dad get dinner started, or, most of all,

18  you shouldn't be talking to other people you don't know and

19  sending pictures of yourself.  You should be doing kid

20  things --

21          THE COURT:  Slow down a little bit.

22          THE DEFENDANT:  I'm sorry.  You should be doing kid

23  things such as video games, football, hanging out with others

24  your own age.  And I'm so very sorry if I hurt anyone mentally

25  because of my desire to be someone I wasn't.  I most certainly

1 hope not.  And I hope that all victims continue to grow up and

2 be someone important.  After all, they are our future.

3          And if I could go back in time, I would be my real

4 self, my real caring self, and not to talk to minors under 18

5 because I have no business talking to someone that young

6 anyway.  And I've begun to work on some goals for my time

7 incarcerated.  I'd like to find work with UNICOR and earn some

8 money.  And I'd like to attend groups, therapy, and counseling.

9          I want to find myself and become myself, not a lonely

10 old man.  I want to feel a real Brian Salvado, the one people

11 can look up to in a positive way.  I'm also happy to say I'm

12 working on a home plan for post incarceration.  Thank you,

13 everyone.  God bless you all.  Happy holidays.  And please be

14 safe.

15          THE COURT:  Is that readable?

16          THE DEFENDANT:  Sort of.

17          THE COURT:  I was going to say --

18          THE DEFENDANT:  I can rewrite it.

19          THE COURT:  Give it to the court reporter in case she

20 needs it.

21          THE DEFENDANT:  Okay.

22          MR. WEITZMAN:  There's parts that have been crossed

23 out, Your Honor, so I can read into the record whatever the

24 Court would like.  And if I may, Your Honor, I think that his

25 struggle to even be audibly understood further underscores the

1  struggles that this man has had.  This is not a man who ought

2  to serve 30 years in jail, this is a man who is deserving of

3  the Court's mercy.

4          THE COURT:  Mr. Haugsby, do you wish to speak on

5  behalf of the Government?

6          MR. HAUGSBY:  Just briefly, Your Honor.  I do agree

7  with one thing that Mr. Weitzman said.  This is -- I think he

8  described the potential sentence in this case as tragic.  That

9  may be.  But I think what happened to the victims in this case

10  can't be ignored either.  That is also tragic.

11          The Defendant in this case may have been engaging in

12  what he thought was a fantasy or the endeavoring to connect

13  with other people through the chat sites that he would visit.

14  But the Defendant knew that the people he was chatting with

15  were minors.  And we're not talking about one victim or two

16  victims or a case of mistake or three victims or four victims

17  or even five victims.  We're talking about 11 victims in this

18  case, all of whom the Defendant knew were under age.

19          This is not mistake, this is intentional conduct.

20  This is seeking out young people to victimize in this way.  Mr.

21  Weitzman describes the Defendant as a non-contact offender.

22  And that's true in a sense, obviously.  But, you know, the

23  facts of this case are that the Defendant's contacted these

24  victims in a very meaningful and troubling way, and these

25  victims are going to be dealing with that for years to come.

13

1   The Defendant may not have been physically present for the

2   conduct, but he is directing that conduct and requesting that

3   these victims engage in this illegal conduct by using the

4   internet.  And that in itself is troubling.

5            Mr. Weitzman, I think, also described that the

6   circumstances may have been murky, I think was the word he

7   used.  The text messages that Mr. Salvado was exchanging with

8   these boys could not have been clearer.  He may have thought he

9   was on an adult website, but he knew he was talking to

10  juveniles and asking them to share with him sexually explicit

11  conduct, pictures of themselves.

12           I think Mr. Weitzman said he was not targeting

13  juveniles.  I would take issue with that.  I mean, again, this

14  isn't the case of one person in one chat room where he's

15  discovered that they were a minor.  This is 11 different

16  victims, all of whom he knew were minors.  The Defendant

17  indicated that he knew from an early age what was right and

18  what was wrong and says that at 47 he is still learning.

19           I think that it's evident in this case that the

20  Defendant knew that the conduct that he was engaging in was

21  wrong and repeatedly engaged in it and continued to do so.

22  He's right that it was hurtful and selfish, and that certainly

23  is unfortunate.  But I understand Mr. Weitzman to be making an

24  eloquent argument regarding the Defendant's own victimhood, but

25  would urge the Court not to ignore the 11 other victims that

1  have been identified in this case.

2          And those 11 victims, that number of victims is what

3  drove the guidelines to where they are.  Again, this isn't a

4  case where you had one victim where I could potentially

5  understand the significant, really extraordinary variance that

6  Mr. Weitzman is arguing for.  Here, we're not talking about one

7  victim or two victims, like I said, it's 11 victims.  And

8  that's why the guidelines are where they are.

9          So the Government would be recommending that the

10  Court impose that guideline sentence.  I don't think Mr.

11  Weitzman addressed further the financial penalties in this

12  case, but did want to mention that at paragraph 54 of the

13  pre-sentence report, there is mandatory restitution --

14          MR. WEITZMAN:  I think it's 154.

15          MR. HAUGSBY:  I thought I said that.  I may have

16  misspoken, I apologize.  154 is what I was mentioning.  The

17  Amy, Vicky, and Andy Child Pornography Victim Assistance Act is

18  applicable in this case.  I don't think there is a dispute

19  between the Government and Defendant --

20          THE COURT:  Unless he's otherwise found to be

21  indigent.  Those words do apply to that Act.

22          MR. HAUGSBY:  Okay.  Well, again, the Government

23  would argue that the Court should take into consideration the

24  Defendant's age right now.  And while he may be indigent in

25  this moment, I think there's good reason to believe that the

15

1   Defendant will be employed as an inmate in the federal

2   correctional system and may be employed upon his release.  And

3   so the Court should not make a determination regarding his

4   ability to make that restitution based upon his current

5   circumstances alone.  Thank you.

6          THE COURT:  I will impose sentence at this point and

7   then give my reasonings thereafter.

8          AND NOW, this 25th day of November, the year 2020,

9   the Defendant appearing in court for purposes of sentencing.

10  Pursuant to the Sentencing Reform Act of 1984, and after having

11  considered the factors set forth in 18 U.S.C. Section 3553(a),

12  it is the judgment of the Court that the Defendant, Brian

13  Salvado, is hereby committed to the custody of the Bureau of

14  Prisons to be imprisoned for a term of 240 months.

15         The Court finds that the Defendant does not have the

16  ability to pay a fine.  It is ordered that the Defendant shall

17  pay to the Clerk, U.S. District Court, a special assessment of

18  100 dollars, due immediately.  The assessment pursuant to the

19  Justice For Victims of Trafficking Act is not imposed.  The

20  Court will give its reasons for that.

21         Upon release from imprisonment, the Defendant shall

22  be placed on supervised release for a term of 15 years.  Within

23  72 hours of release from the custody of the Bureau of Prisons,

24  the Defendant shall report in person to the probation office in

25  the district to which the Defendant is released.

16

1          While on supervised release, the Defendant shall not

2   commit any federal, state, or local crime, and shall not

3   possess a dangerous weapon.  The Defendant shall comply with

4   the standard conditions that have been adopted by this Court

5   and with the following additional conditions:

6          1, You must cooperate in the collection of a DNA

7   sample as directed by the probation officer; 2, You must submit

8   to substance abuse testing to determine if you have used a

9   prohibited substance.  You must not attempt to obstruct or

10  tamper with the testing method; 3, You must apply all monies

11  received from tax refunds, lottery winnings, judgments, or

12  other anticipated financial gains to any outstanding

13  court-ordered financial obligation.

14         4, You must provide the probation officer access to

15  any requested financial information and authorize the release

16  of any financial information.  The probation office may share

17  financial information with the U.S. Attorney's office; 5, You

18  must not incur new credit charges or open additional lines of

19  credit without the approval of the probation officer.

20         6, You must not have direct contact with any child

21  you know, or reasonably should know, to be under the age of 18

22  without the permission of the probation officer.  If you do

23  have direct contact with any child you know, or reasonably

24  should know, to be under the age of 18, without permission of

25  the probation officer, you must report this contact to the

1  probation officer within 24 hours.

2          Direct contact includes written communication,

3  in-person communication, or physical contact.  Direct contact

4  does not include incidental contact during ordinary daily

5  activities in public places.

6          7, You must not have any contact with the victims of

7  this offense; 8, You must participate in a sex offense specific

8  assessment; 9, You must participate in a sex offense specific

9  treatment program and follow the rules and regulations of that

10 program.  The probation officer will supervise your

11 participation in the program, which could include an evaluation

12 and completion of any recommended treatment.

13         10, You must submit to periodic polygraph testing at

14 the discretion of the probation officer as a means to insure

15 that you are in compliance with the requirements of your

16 supervision or treatment program.

17         11, You must submit your computer, as defined in 18

18 United States Code, Section 1030(e)(1), or other electronic

19 communication or data storage devices or media to a search.

20 You must warn any other people who use these computers or

21 devices capable of accessing the internet that the devices may

22 be subject to searches pursuant to this condition.

23         A probation officer may conduct a search pursuant to

24 this condition only when reasonable suspicion exists that there

25 is a violation of a condition of supervision and that the

18

1  computer or device contains evidence of this violation.  Any

2  search will be conducted at a reasonable time and in a

3  reasonable manner.

4          12, You must submit your person, property, house,

5  residence, vehicle, papers, computers, as defined aforesaid,

6  other electronic communications or data storage devices or

7  media or office to a search conducted by a United States

8  Probation Officer.  Failure to submit to a search may be

9  grounds for revocation of release.  You must warn any other

10  occupants that the premises may be subject to searches pursuant

11  to this condition.

12          Now the following statement of reasons is placed on

13  the record for the sentence that has been imposed.  The Court

14  has imposed a sentence below the guideline range, and it is

15  considered to be a variance for the following reasons:

16          First of all, I have not imposed the special

17  assessment pursuant to the Justice For Victims of Trafficking

18  Act.  His employment history has been very sporadic.  He is

19  dyslexic.  He does not have a higher education.  And he will be

20  at an advanced age when he is released.  The money that he will

21  receive through the Bureau of Prisons at this point cannot even

22  be estimated.

23          We have departed from the guideline range for the

24  following reasons:  He falls within the minority of production

25  offenders that were never physically present with their

1  victims.  I have placed a great deal of emphasis on the fact

2  that he has not had personal contact with these victims albeit

3  the victims have suffered.  He has no criminal history

4  involving child pornography.  And his prior convictions have

5  been minor.  He has submitted evidence to an evaluating

6  psychologist which shows that his risk of re-offending is

7  relatively low, I think it's estimated to be about 12 percent,

8  of future child pornography.

9           Now, sir, you can appeal your conviction, and you

10 have the right to appeal your sentence to the United States

11 Court of Appeals.  You have 14 days from this day in which to

12 file a notice of an appeal.  If you are unable to pay the costs

13 of an appeal, you may apply for leave to appeal in forma

14 pauperis.  If approved, counsel will be appointed for you and

15 you will not be required to pay any costs.  You may also

16 request the Clerk of Court to prepare and file a notice of

17 appeal on your behalf.

18          THE DEFENDANT:  Thank you.

19          THE COURT:  Anything further?

20          MR. HAUGSBY:  Can I have one moment, Your Honor?

21          THE COURT:  Yes.

22          (Mr. Haugsby and Mr. Weitzman confer.)

23          MR. HAUGSBY:  Your Honor, just briefly.  I didn't

24 hear Your Honor rule on the issue regarding the Amy, Vicky, and

25 Andy Child Pornography Victim Assistance Act of 2018.  You had

20

1    indicated during the sentencing that that fine, the mandatory

2    minimum restitution --

3              THE COURT:  Five thousand.

4              MR. HAUGSBY:  Well, no, for the JVTA was 5000.  But

5    there's a minimum restitution that's owed to each identified

6    victim of the Defendant's conduct under Title 18 of the United

7    States Code, Section 2259.  There is a mandatory restitution

8    provision for the trafficking in child pornography.  And under

9    Section (b)(2), it provides that if the Defendant is convicted

10   of trafficking in child pornography, the Court shall order

11   restitution under this section in an amount to be determined.

12   The minimum amount under Section (b)(2)(B) is 3000 dollars per

13   victim.  And I would just draw the Court's attention to the

14   fact that under Section (b)(3) --

15             THE COURT:  (b)(3) of what?

16             MR. HAUGSBY:  Of Section 2259 of Title 18.

17             THE COURT:  Is that small B in parentheses?

18             MR. HAUGSBY:  Yes, it's small B.

19             THE COURT:  And 3?

20             MR. HAUGSBY:  And then it's 3 and 4.  And 4 is really

21   more operative, I apologize.  The order is mandatory.  I just

22   wanted to make the record that the issuance of a restitution

23   under this section is mandatory, and subpart b of subpart 4

24   says that the Court may not decline to issue an order under

25   this section because of the economic circumstances of the

21

1  Defendant.

2          The statute has already contemplated that a Defendant

3  found guilty of violating these child pornography statutes may

4  be indigent, but that the restitution award is still mandatory

5  and that there's a minimum amount.  So I would ask that the

6  Court impose that restitution award for each of the 11 victims.

7          THE COURT:  Mr. Weitzman.

8          MR. WEITZMAN:  Your Honor, this is a fairly new

9  provision that was passed approximately one year ago.  I know

10  the genesis of this particular provision was to cut down on the

11  litigation for child pornography that was in circulation.  As

12  the Court is well aware, no identified victims have submitted

13  claims.  And that has been disputed by defense attorneys for

14  years.

15          I think the anomaly in Mr. Salvado's case is, there

16  is no actual restitution owed to any of these victims.  On that

17  basis, we would object and do not believe that the Court must

18  impose a 3000 dollar per victim restitution amount.

19          THE COURT:  None of these victims have produced

20  anything showing what expenses they incurred in getting

21  treatment or anything of that nature.

22          MR. HAUGSBY:  But the law sets as a statutory matter

23  that the floor for each victim is 3000 dollars.  It says it

24  right in the statute.  I understand what Mr. Weitzman is

25  arguing.

22

1        THE COURT:  Why is it that this was not reported to

2   me before?

3        MR. HAUGSBY:  Your Honor, respectfully, it is in the

4   pre-sentence report at paragraph 154.  And I don't believe

5   there was an objection to this aspect of the report.

6        THE COURT:  It seems to me that the victim would have

7   to show some financial loss.

8        MR. HAUGSBY:  I don't believe that's true, Your

9   Honor.  And in fairness, this is a provision that I haven't had

10  to litigate, but my understanding from the plain terms of the

11  statute is that the statute presumes a minimum amount of

12  restitution for each of these victims of 3000 dollars.  And the

13  statute makes that restitution award mandatory.

14       THE COURT:  I'm going to take a recess.

15       COURTROOM DEPUTY:  Court's in recess.

16       (Recess was taken at 10:05 a.m. and proceedings

17         reconvened at 10:20 a.m.)

18       THE COURT:  The Court stands by its order.  I will

19  not impose the 3000 dollar assessment because I must determine

20  the loss.  I need to know how I determine the loss without

21  anything in front of me to determine what each victim's loss

22  was.  I take note that under 2259(c)(2) sets forth the full

23  amount of victim's losses, and it sets forth medical services,

24  physical and occupational therapy, necessary transportation,

25  housing, lost income, reasonable attorney's fees, etc.  How can

23

1    I determine loss when I don't have anything in front of me?

2             MR. HAUGSBY:  I don't think I understand your

3    question, Your Honor.

4             THE COURT:  I need to know how I can determine what

5    the loss is in order to award these amounts under the statute.

6             MR. HAUGSBY:  So I think I agree with -- I think I

7    understand what Your Honor is saying in that, you know, if you

8    were going to set a specific dollar amount based upon the

9    victim's specific losses that they could present to Your Honor

10   here today, that would be one way of fixing the actual

11   restitution amount that that victim is owed, if you could

12   calculate it down to the penny based upon evidence that was

13   being submitted.

14            The point I was just trying to make, and probably was

15   not doing it in the most articulate way, because, as Mr.

16   Weitzman noted, the statute is relatively new and it's not --

17   I'm not overly familiar with it, but I do understand the

18   statute to set a minimum floor and presume definitively that

19   the minimum amount of restitution awarded to any victim of this

20   offense is 3000 dollars.  And that's how I read the statute.

21            THE COURT:  You're saying the very fact he's a

22   victim, he's entitled to 3000 dollars?

23            MR. HAUGSBY:  Yes.

24            THE COURT:  I'm sorry, you can take that to the Court

25   of Appeals.

24

1    MR. HAUGSBY:  Okay, Your Honor.  I'm just making my
2 record.
3    THE COURT:  I understand where you're coming from,
4 but I still think I need to make a determination of whether he
5 actually has a loss.
6    MR. HAUGSBY:  And, Your Honor, to the extent that I
7 need to do this, I'm doing it in the most respectful way, I
8 just would note my objection to the Court's ruling on that.
9 And to the extent I can provide any other argument, I will.
10 But I think I understand the Court's ruling.
11    THE COURT:  I can give you 90 days in which to
12 convince me otherwise.
13    MR. HAUGSBY:  I would ask that you would hold it open
14 just in case, just to allow us that opportunity.
15    THE COURT:  I will give you 90 days from this date.
16    MR. WEITZMAN:  I'm not sure the Court is able to
17 procedurally hold the record open in that manner, so we do
18 object to that.
19    MR. HAUGSBY:  I believe the statute specifically
20 provides that the Court can hold it open for 90 days.
21    THE COURT:  Right.
22    MR. WEITZMAN:  I'm lodging our objection nonetheless.
23    MR. HAUGSBY:  We can make a record of the statute
24 itself if you want to do that.
25    THE COURT:  I'm going to hold it open for 90 days.

25

1          MR. HAUGSBY:  Very good.

2          THE COURT:  Okay.

3          MR. HAUGSBY:  Thank you, Your Honor.

4          THE COURT:  Court's adjourned.

5          MR. WEITZMAN:  Your Honor, we're asking for a

6  judicial recommendation that Mr. Salvado be placed at U.S.P.

7  Marion.

8          THE COURT:  Marion?

9          MR. WEITZMAN:  I believe it's outside of Illinois,

10  Your Honor.

11          THE COURT:  Illinois, right.  Thank you.  I wanted to

12  make sure.

13          MR. HAUGSBY:  Your Honor, if you just would bear with

14  me momentarily, I believe there are counts we were going to

15  seek dismissal of.

16          THE COURT:  Okay.

17          MR. HAUGSBY:  I just need to make sure which they

18  are.

19          THE COURT:  We will recommend Marion, Illinois.

20          MR. HAUGSBY:  Your Honor, the Government at this time

21  would move to dismiss Counts 2, 3, and 4 of the indictment.

22          THE COURT:  Counts 2, 3, and 4 of the indictment are

23  dismissed.

24          MR. HAUGSBY:  Thank you.

25          THE COURT:  Court's adjourned.

26

1      COURTROOM DEPUTY:  Court's adjourned.

2          (Proceeding adjourned at 10:24 a.m.)

3          *****************************************

4

5                        CERTIFICATION

6

7          I, Wendy C. Yinger, Federal Official Realtime Court

8  Reporter, in and for the United States District Court for the

9  Middle District of Pennsylvania, do hereby certify that

10  pursuant to Section 753, Title 28, United States Code, that the

11  foregoing is a true and correct transcript of the

12  stenographically reported proceedings held in the

13  above-entitled matter and that the transcript page format is in

14  conformance with the regulations of the Judicial Conference of

15  the United States.

16

17                        /s/ Wendy C. Yinger
                          ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
                          Wendy C. Yinger, RMR, CRR
18                        U.S. Official Court Reporter
                          (717)440-1535
19

20

21      (The foregoing of this transcript does not apply to any
    reproduction of the same by any means unless under the direct
22  control and/or supervision of the certifying reporter.)

23

24

25